**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION**

**DONNA JEAN BOWEN,**

       **Plaintiff,**

**vs.**                                      **Case No. 4:08cv492-MP/WCS**

**MICHAEL J. ASTRUE,
Commissioner of Social Security,**

       **Defendant.**

_____/

## REPORT AND RECOMMENDATION

This is a social security case referred to me for a report and recommendation

pursuant to 28 U.S.C. § 636(b) and N.D. LOC. R. 72.2(D). It is recommended that the

decision of the Commissioner be reversed and benefits be awarded.

**Procedural status of the case**

Plaintiff, Donna Jean Bowen, applied for disability insurance benefits. Her last

date of insured status for disability benefits is December 31, 2008. Plaintiff alleges

disability due to fibromyalgia, carpal tunnel syndrome, arthritis, headaches, fatigue, and

depression, with onset on March 16, 2003.

Plaintiff was 49 years old at the time of the administrative hearing (on May 22, 2007), has a bachelor of science degree, and has past relevant work as a government analyst.  The Administrative Law Judge found that Plaintiff had the residual functional capacity to perform a full range of unskilled light work, and thus was not disabled.

**Legal standards guiding judicial review**

This court must determine whether the Commissioner's decision is supported by substantial evidence in the record and premised upon correct legal principles.  Chester v. Bowen, 792 F.2d 129, 131 (11th Cir. 1986).  "Substantial evidence is more than a scintilla, but less than a preponderance.  It is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." Bloodsworth v. Heckler, 703 F.2d 1233, 1239 (11th Cir. 1983) (citations omitted); Moore v. Barnhart, 405 F.3d 1208, 1211 (11th Cir. 2005).  "The Commissioner's factual findings are conclusive if supported by substantial evidence." Wilson v. Barnhart, 284 F.3d 1219, 1221 (11th Cir. 2002).  "If the Commissioner's decision is supported by substantial evidence we must affirm, even if the proof preponderates against it." Phillips v. Barnhart, 357 F.3d 1232, 1240, n. 8 (11th Cir. 2004) (citations omitted).  The court must give "substantial deference to the Commissioner's decision." Dyer v. Barnhart, 395 F.3d 1206, 1211 (11th Cir. 2005).

A disability is defined as a physical or mental impairment of such severity that the claimant is not only unable to do past relevant work, "but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . ."  42 U.S.C. § 423(d)(2)(A).  A disability is an

"inability to engage in any substantial gainful activity by reason of any medically

determinable physical or mental impairment which can be expected to result in death or

which has lasted or can be expected to last for a continuous period of not less than 12

months . . . ."  42 U.S.C. § 423(d)(1)(A).  Both the "impairment" and the "inability" must

be expected to last not less than 12 months.  Barnhart v. Walton, 535 U.S. 212, 122

S.Ct. 1265, 1272, 152 L.Ed.2d 330 (2002).

      The Commissioner analyzes a claim in five steps.  20 C.F.R. § 404.1520(a)-(f):

1.     Is the individual currently engaged in substantial gainful activity?

2.     Does the individual have any severe impairments?

3.     Does the individual have any severe impairments that meet or
     equal those listed in Appendix 1 of 20 C.F.R. Part 404?

4.     Does the individual have any impairments which prevent past
     relevant work?

5.     Do the individual's impairments prevent other work?

A positive finding at step one or a negative finding at step two results in disapproval of

the application for benefits.  A positive finding at step three results in approval of the

application for benefits.  At step four, the claimant bears the burden of establishing a

severe impairment that precludes the performance of past relevant work.  If the claimant

carries this burden, the burden shifts to the Commissioner at step five to establish that

despite the claimant's impairments, the claimant is able to perform other work in the

national economy.  Chester, 792 F.2d at 131; MacGregor v. Bowen, 786 F.2d 1050,

1052 (11th Cir. 1986).  If the Commissioner carries this burden, the claimant must prove

that he or she cannot perform the work suggested by the Commissioner.  Hale v.

Bowen, 831 F.2d 1007, 1011 (11th Cir. 1987).

**Evidence from the administrative hearing**[1]

Plaintiff testified that she left her work in March, 2003, due to fibromyalgia

syndrome and major related symptoms.  R. 332.  She said she could not keep up with

this work, and had had a problem with absenteeism for years in that work.  R. 332-333.

She said that in the last years, she became caught up in a pain cycle and would be out

of work for weeks at a time.  R. 333.  She resigned when she had a mental breakdown

resulting in hospitalization.  *Id.*

Plaintiff said that her most serious medical problem causing her to be unable to

work was "this cycle of pain that I get into with any kind of stress."  R. 335.  The pain is

most severe in her neck and hips, but she experiences pain all over.  *Id.*  The pain, she

said, is from four to six on a scale of ten.  *Id.*  On a bad day, the neck pain is eight and

the hip pain is ten.  R. 336.  She said that during the past month, she had been "out of

commission about, I'd say 12 days," and 12 days a month was normal.  *Id.*

Plaintiff said that during the day, she awakes at about 10:00 a.m., takes some

medications, does some stretching, and then soaks in the bathtub for an hour and 15

---

[1] Descriptions of the purpose and effects of prescribed drugs are from PHYSICIANS' DESK REFERENCE, as available to the court on Westlaw, or PDRhealth™, PHYSICIANS DESKTOP REFERENCE, found at http://www.pdrhealth.com/drugs/drugs-index.aspx. Information about medical terms and prescription drugs come from DORLAND'S MEDICAL DICTIONARY FOR HEALTH CONSUMERS, available at:  http://www.mercksource.com (Medical Dictionary link).  Social Security Rulings can be found at: http://www.ssa.gov/OP_Home/rulings/rulfind1.html.  The pages at these websites are not attached to this report and recommendation because the information is relatively well-settled, the precise definitions are not at issue in this case and are not likely to be in dispute.

minutes. *Id.* After that, she lies down in her bed and does a stretching routine that she learned in physical therapy for her hips and shoulders. *Id.* and R. 337. After that, she takes a nap because she is exhausted. R. 337. She does not leave the bed for a couple of hours, and does so to eat. *Id.* In the afternoon, she tries to "do something constructive" if she can. *Id.* She also does relaxation therapy. *Id.* If it is a bad day, she takes an extra dose of medication. *Id.*

Plaintiff said that her second most serious problem was "a great deal of depression." R. 338. She said she has a lot of anxiety doing things on her own. *Id.* She said she had had depression for a "very long time." *Id.* She experiences feelings of "not wanting to go, not wanting to, to live." *Id.* The feelings are both hopelessness and helplessness. *Id.* She said that when her job ended, she was so depressed that she was seeing and hearing things, and hallucinations would occur periodically. *Id.* She said that the hallucinations were occurring less frequently now because "I'm subjected to less and less stress in my life." R. 338-339.

Plaintiff said she had numbness of her left hand. R. 339. She also had muscle tension and migraine headaches a few times a month. R. 339.

Plaintiff said that she is sometimes forgetful with respect to taking medications. R. 341. Her medications make her "really, really sleepy." *Id.*

Plaintiff said that as a result of her problems, she can sit for only about 30 minutes. R. 340. Her ability to stand is more impaired, she said, due to hip pain. *Id.* She thought that she could slowly walk 100 yards. *Id.* She walks to the end of the block, three houses down, a few times a week. R. 346. She does not walk her dog. R.

347.  She said she can lift a 20 pound bag of dog food.  R. 340.  She said she is able to

drive, but does not drive if she is dizzy or sleepy.  R. 342.  She said her parents do a lot

of things for her.  *Id.*  She said that she goes outside the home for a couple of hours a

couple of times a month, and her friends encourage her to do that.  *Id.*  She talks with

them, has dinner, and sometimes a movie.  R. 346.  She said she lives part of the time

with her parents.  R. 343.  Some times she drives herself and sometimes her parents

pick her up.  *Id.*  She does laundry, cleans her room, and shops for groceries weekly.

R. 346.

The vocational expert testified that in his opinion, missing three days a month at

work "becomes problematic or eliminates positions."  R. 353.  He said that "anything

over three plus [days absent from work] is, is going to start eroding significantly the . . .

economic base of the . . . labor base."  R. 354.

**Legal analysis**

### Whether the ALJ erred by not discussing medical evidence that predated the alleged onset date, March 16, 2003

The Administrative Law Judge did not discuss any evidence earlier than January

21, 2003.  R. 364-366.  Plaintiff asserts that the ALJ should have discussed records

from Plaintiff's former employer and from Dr. Szczesny, even though the evidence

predated her alleged onset date, on March 16, 2003.  Doc. 32, p. 14.

Defendant contends that as a matter of law, the ALJ had no duty to *develop* the

evidence prior to March 16, 2003, the date of alleged onset of disability.  Doc. 35, pp. 4-

5.  Cited for this is Ellison v. Barnhart, 355 F.3d 1272, 1276 (11th Cir. 2003).  The only

issue in Ellison was the duty of the Administrative Law Judge to fairly develop the

record.[2]  Citing 20 C.F.R. § 416.912, the court said that the ALJ was required to develop

the medical history for the 12 months prior to the date of the application.[3]  355 F.3d at

1276.  The court's reference to the regulation in Ellison, however, was unnecessary to

the decision.  The reference was not directed to the issue to be decided, whether the

duty to fairly develop the record included a duty to develop medical evidence from the

period *after* the application was filed.  *Id.*

Ellison did not say that the *Plaintiff* was precluded from presenting evidence

predating the date of her application by more than 12 months.  Moreover, Ellison did not

pass upon the question of the *relevance* of such evidence.  The duty to fairly develop

the record is quite different from the relevance of evidence, or the duty to consider

relevant evidence in the record.  Indeed, this court must look at the entire record as it

applies the substantial evidence standard:

> A "substantial evidence" standard, however, does not permit a court to
> uphold the Secretary's decision by referring only to those parts of the
> record which support the ALJ.  A reviewing court must view *the entire
> record* and take account of evidence in the record which detracts from the
> evidence relied on by the ALJ.

---

[2] "Because a hearing before an ALJ is not an adversary proceeding, the ALJ has a *basic* obligation to develop a full and fair record."  Graham v. Apfel, 129 F.3d 1420, 1422 (11th Cir. 1997) (emphasis added), *citing*, Cowart v. Schweiker, 662 F.2d 731, 735 (11th Cir. 1981).

[3] Ellison was a claim for supplemental security income benefits, and the earliest "onset" for an award of such benefits is necessarily the date of the application. "Payment of [supplemental security income] benefits may not be made for any period that precedes the first month following the date on which an application is filed or, if later, the first month following the date all conditions for eligibility are met."  20 C.F.R. § 416.501.  *See also* 20 C.F.R. 416.330(a) ("If you meet all the requirements for eligibility while your application is in effect, the earliest month for which we can pay you benefits is the month following the month that you first meet all the requirements.").

<u>Tieniber v. Heckler</u>, 720 F.2d 1251, 1253 (11th Cir. 1983) (emphasis added). *See also,* <u>Cowart v. Schweiker</u>, 662 F.2d 731, 735 (11th Cir. 1981) (citations omitted) ("Unless the Secretary has analyzed all evidence and has sufficiently explained the weight he has given to obviously probative exhibits, to say that his decision is supported by substantial evidence approaches an abdication of the court's 'duty to scrutinize the record as a whole to determine whether the conclusions reached are rational.' ").  Defendant's legal argument is unpersuasive.

As an apparent alternative, Defendant argues that "the older records may be of some historical value, [but] they are not directly relevant to the period at issue, and the ALJ did not err in failing to discuss them."  Doc. 35, p. 5.  This relevance argument is plainly wrong.  Relevance in Social Security disability cases has no bright line of demarcation.  Though healing often occurs, especially in younger people, illness and injury have a way of growing worse over the years.  At some point, of course, a particular medical record may be irrelevant because too remote to have any bearing upon the claimant's current condition.  But the test for relevance is a familiar one, whether the medical record has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."  Fed. R. Evid. 401.

Defendant relied entirely upon this faulty legal argument, and failed to address the relevance of these medical records.  Doc. 35, p. 5.  Plaintiff, on the other hand, has shown that the records predating the date of alleged onset, March 16, 2003, are quite relevant.

On April 9, 1999, John M. Szczesny, M.D., wrote to Stanley J. Gwock, M.D., who had referred Plaintiff to Dr. Szczesny. R. 148. Dr. Szczesny is a rheumatologist. R. 129. He found: "The musculoskeletal exam is positive for soft tissue tenderness in a fibromyalgia distribution in both the upper and lower extremities, shoulder and neck girdle." R. 148. Dr. Szczesny agreed with Dr. Gwock's clinical impression that Plaintiff has fibromyalgia. *Id.* Dr. Szczesny added that Plaintiff's fibromyalgia was "definitely complicated by the problems with her anxiety and depression." *Id.* Dr. Szczesny said that Plaintiff had had a history of about one and one half years of musculoskeletal pain and general pain affecting both joint and muscle tissue, associated with tension headaches. *Id.* He reported that Plaintiff had been suffering from depression, and had been seeing a counselor. *Id.* She was then taking Ambien (for sleep),[4] Zoloft,[5] and Klonopin.[6] *Id.* He discontinued Ambien, prescribed Wellbutrin,[7] and recommended an exercise program. *Id.*

On February 24, 2000, Plaintiff was seen again by Dr. Szczesny. R. 139. She complained of severe headaches, and increasing pain and fatigue. *Id.* Dr. Gwock had increased her dosage of Klonopin to help with the headaches. *Id.* Plaintiff reported that

---

[4] Ambien is indicated for short term insomnia. Physicians' Desk Reference (2005).

[5] Zoloft is prescribed for major depression – a persistently low mood that interferes with everyday living. PDRhealth™, Physicians Desktop Reference.

[6] Klonopin is used alone or along with other medications to treat convulsive disorders such as epilepsy. It is also prescribed for panic disorder, that is, unexpected attacks of overwhelming panic accompanied by fear of recurrence. Klonopin belongs to a class of drugs known as benzodiazepines. PDRhealth™, Physicians Desktop Reference.

[7] Wellbutrin is indicated for treatment of depression. Physicians' Desk Reference (2005).

she had miss a lot of work so far in the year 2000, and had worked only 60 hours in January.  *Id.*  She had severe pain in the morning, and had difficulty getting to work on time.  *Id.* She continued to try to walk for exercise and do stretching exercises.  *Id.*  She was taking Darvocet[8] and Ultram[9] for pain, and continued to take Wellbutrin, Klonopin, and Zoloft.  *Id.*  She had started to talk with her work supervisors about the possibility of a flexible work schedule or to work a couple of days at home.  *Id.*  Dr. Szczesny's diagnosis was fibromyalgia "with increasing problems the past couple of months."  *Id.* He said: "We had a very long discussion about the fibromyalgia and management strategies and she is really doing a lot."  *Id.*  He said she used water therapy, stretching and walking exercises, massage therapy, and acupuncture.  *Id.*  He said that he was sure that stress played a role in these recent flare ups, and he discussed stress management with Plaintiff.  *Id.*

On April 27, 2000, Plaintiff returned to see Dr. Szczesny.  R. 137.  She had participated in a ten week fibromyalgia therapy program.  *Id.*  Her pain and energy levels were improved, and she had been more active since the last visit.  *Id.*

On July 6, 2000, Plaintiff was seen by Paul D. Zislis, M.D., a psychiatrist.  R. 216. Plaintiff reported a history of fibromyalgia prompted by emotional difficulties and stress. *Id.*  Plaintiff said she had been depressed by family problems and had low energy due to fibromyalgia difficulties.  *Id.*  Dr. Zislis determined that Plaintiff suffered from

---

[8] Darvocet-N is used for the relief of mild to moderate pain, with or without fever. PDRhealth™, PHYSICIANS DESKTOP REFERENCE.

[9] Ultram (tramadol hydrochloride tablets) is a centrally acting synthetic opioid analgesic.  PHYSICIANS' DESK REFERENCE (2005).

depression, with a history of fibromyalgia.  R. 217.  He altered the dosages of Zoloft,

Wellbutrin, continued Klonopin, and ordered a trial of Topamax.[10]

On July 20, 2000, Dr. Szczesny said that Plaintiff had had several serious

fibromyalgia flare ups since her last visit, and had worked less than half time in the prior

month.  R. 133.  She had been taken off Zoloft and Topamax had been prescribed.  *Id.*

On August 8, 2000, Plaintiff was again treated by Dr. Zislis for depression.  R.

215.  She saw Dr. Zislis again on September 25, 2000.  R. 214.  She reported she had

had a fibromyalgia flare up.  *Id.*

On October 2, 2000, Dr. Szczesny completed a Family Medical Leave Act leave

form.  R. 128.  He determined that Plaintiff had a category 4 condition, a "chronic

condition requiring treatment."  *Id.* and R. 130.  He explained that Plaintiff suffered from

fibromyalgia, depression, and anxiety, all chronic conditions.  R. 128.  He said:

"Fibromyalgia has no cure and may require treatment indefinitely."  *Id.*  He said that it

was unpredictable whether Plaintiff would be able to work only intermittently or less than

a full schedule because "fibromyalgia is associated with chronic pain and fatigue which

is subject to periodic exacerbations in which symptoms become worse."  *Id.*  He said

that Plaintiff may be periodically incapacitated, and the duration and frequency of the

episodes are unpredictable.  *Id.*  Dr. Szczesny said that Plaintiff's impairment was

treated with medications (Klonopin, Vioxx, and Ultram), exercise, massage therapy, and

stress management.  R. 129.  He said that depending upon the severity of the

---

[10] Topamax is an antiepileptic drug, prescribed to control both the mild attacks known as partial seizures and the severe tonic-clonic convulsions known as grand mal seizures.  It is typically added to the treatment regimen when other drugs fail to fully control a patient's attacks.  PDRhealth™, PHYSICIANS DESKTOP REFERENCE

symptoms, she might be able to work from home. *Id.* Dr. Szczesny said that Plaintiff

could not perform the essential functions of her work because "she is limited in general

by compromised endurance, pain, and fatigue." *Id.*

On October 12, 2000, Dr. Szczesny saw Plaintiff on a follow-up visit. R. 132.

She was "doing fairly well," but had had a flare up since her last visit, and was in "such

bad shape that she had trouble lifting a milk carton" to pour milk and had to get help

from her parents. *Id.* She reported that Vioxx and Ultram had been very helpful with

her pain. *Id.* She continued to work, but had "missed a significant amount of work

because of fibromyalgia." *Id.* She was exercising regularly. *Id.*

On October 27, 2000, Plaintiff's supervisor at the Florida Department of

Revenue, Redgie A. Tedder, wrote a letter to Plaintiff. The supervisor noted that

Plaintiff had used 459 hours of leave without pay during the period January 1, 2000,

through September 30, 2000. R. 127. This is 57.375 days, or 6.375 days per month for

the nine month period. He said: "Your absences and your inability to perform your work

duties has caused concern for not only your well being, but also the continuing

operation of your office and the hardships imposed on other staff in handling your

responsibilities." *Id.* The supervisor directed Plaintiff to obtain "detailed medical

certification from your medical practitioner regarding your ability or inability to perform

your duties as a result of your medical condition." *Id.*

On November 7, 2000, Plaintiff saw Dr. Zislis. R. 213. She reported having

problems at work due to missing work days due to fibromyalgia. *Id.* Her mood and

affect were brighter, and she said she had been feeling better. *Id.*

On November 9, 2000, Dr. Szczesny provided the requested medical certification to Plaintiff's supervisor. R. 124. He said that Plaintiff is capable of performing her work "when she is feeling well." *Id.* "When she is experiencing an exacerbation of her illness, however, her ability to perform any [work duties] will be compromised." *Id.* He said that while he expected to see gradual improvement in her condition, "the frequency, duration, and intensity of her flare ups remain unpredictable." *Id.* He said that Plaintiff would be in a temporary "very debilitated state" when a flare up occurred. *Id.* He explained that fibromyalgia is a chronic illness characterized by sleep disorder, fatigue, malaise, decreased endurance, and musculoskeletal pain, for which there is no cure. *Id.* He recognized that Plaintiff had had frequent flare ups in the past year, "resulting in a significant amount of absenteeism from her job." *Id.* He said that to accommodate Plaintiff's impairment and to help her manage her fibromyalgia, the employer could provide a flexible schedule, allow work to be done from home, provide an ergonomic work station, allow periodic rests, and decrease work stress. *Id.*

On January 3, 2001, Plaintiff returned to see Dr. Szczesny. R. 123. She was doing "fairly well" since her last visit. *Id.* She continued to have "mild musculoskeletal pain." *Id.*

On February 6, 2001, Plaintiff returned to Dr. Zislis. R. 212. She continued to have problems with fibromyalgia and missing work. *Id.* She felt overwhelmed with responsibilities at work, and felt she could never finished the work that she needed to finish. *Id.* She said she cried most days. *Id.*

On March 6, 2001, Plaintiff was seen again by Dr. Zislis. R. 211.

On March 23, 2001, Plaintiff was seen by Richard E. Blackburn, M.D., a neurologist, on referral by Dr. Gwock for "chronic multifocal pain." R. 229. Plaintiff said that she had been in constant pain since 1997. *Id.* She said that the pain was in both hips, ran down to her mid-calf, around to her abdomen, in the shoulders, and in the neck to the back of the head. *Id.* She was then taking Ultram, clonazepam (Klonopin),[11] Amitriptyline,[12] Wellbutrin, Topamax, and Darvocet. *Id.*

On March 28, 2001, Plaintiff saw Dr. Szczesny. R. 122. He found her to be doing generally much better. *Id.* She had had one flare up since January 3rd, a flare up that lasted several weeks. *Id.* Plaintiff said that she "spent a good deal of time in bed and reports that she was so weak afterwards that she required use of cane for several days." *Id.* He noted that she had been referred to Dr. Blackburn for her headaches. *Id.* She had had a change of supervisors at work, some changes in job for work that was less time sensitive, and "both of those changes are favorable to her." *Id.* She exercised daily by walking. *Id.* After examination, Dr. Blackburn's impression was chronic pain syndrome with multifocal pain, which "certainly fits with fibromyalgia." R. 231. His only recommendation was to get an MRI of the brain to rule out multiple sclerosis or "any type of structural problem at the cranial cervical junction." *Id.* He prescribed

---

[11] The brand name of Clonazepam is Klonopin. It is prescribed for seizures and panic attacks. PHYSICIANS' DESK REFERENCE (2005).

[12] Amitriptyline hydrochloride is a tricyclic antidepressant having sedative effects; it is also used for treatment of chronic pain. DORLAND'S MEDICAL DICTIONARY FOR HEALTHCARE CONSUMERS.

Neurontin.[13]  *Id.*  He concluded: "Obvious this is going to be a longstanding problem."
*Id.*

On April 5, 2001, Plaintiff was seen by Dr. Zislis.  She said she was "doing pretty well" because March was "good to me weather-wise."  R. 210.  The diagnosis continued to be depression and fibromyalgia, and medications were continued.  *Id.*

She returned to Dr. Blackburn on May 2, 2001.  R. 228.  The brain MRI had not yet been done.  Plaintiff reported that she "did great in March and the first half of April and then developed diffuse multifocal muscle pain and tightness."  *Id.*  She was just getting over that.  *Id.*  His diagnosis was chronic multifocal pain compatible with fibromyalgia.  *Id.*

On June 6, 2001, Plaintiff went again to Dr. Zislis.  R. 209.  She had been walking more, and was feeling better.  *Id.*  Her depression was thought to be stable.  *Id.*

On June 15, 2001, Dr. Blackburn noted that the brain MRI was normal.  R. 227. Plaintiff was feeling better on Neurontin.  *Id.*  He entered the same diagnosis.  *Id.*

On September 4, 2001, she saw Dr. Zislis.  R. 209.  Plaintiff said she had been busy and doing well.  *Id.*  Her pain had been better until the last week, when it increased.  *Id.*

---

[13] Neurontin has two uses.  First, it may be prescribed with other medications to treat partial seizures (the type in which symptoms are limited).  It can be used whether or not the seizures eventually become general and result in loss of consciousness.  Second, it can be used to relieve the burning nerve pain that sometimes persists for months or even years after an attack of shingles (herpes zoster).  PDRhealth™, PHYSICIANS DESKTOP REFERENCE.

On December 31, 2001, Plaintiff saw Dr. Zislis.  R. 208.  She reported she was moving very slowly.  *Id.*  She had had flare ups of fibromyalgia and had to stay out of work for one week.  *Id.*  Depression and fibromyalgia were the diagnoses.  *Id.*

On January 9, 2002, Plaintiff saw Dr. Blackburn.  R. 226.  He again said Neurontin helped a great deal with her muscle pains.  *Id.*  She was seeing a massage therapist at times, did some stretching, but not on a regular basis, and was not doing any regular exercises.  *Id.*  The diagnosis was fibromyalgia and tension headaches.  *Id.*

On February 6, 2002, Plaintiff told Dr. Zislis she was doing better but had an increase in fibromyalgia.  R. 207.  Zoloft and Wellbutrin had helped.  *Id.*

On April 23, 2002, Plaintiff saw Dr. Zislis.  R. 206.  She was doing fairly well but still had some depression.  *Id.*  She continued to move slowly due to fibromyalgia, and to be socially isolated due to anxiety.  *Id.*

On July 23, 2002, Plaintiff was seen by Dr. Zislis.  R. 204.  She presented with a "brighter mood and affect than I have seen her to have in quite some time."  *Id.*  It was thought that the increase in Zoloft dosage may have helped.  *Id.*  Her medications were continued.  *Id.*

On October 4, 2002, Plaintiff again saw Dr. Blackburn.  R. 224.  Her headaches had become worse, more frequent and severe.  *Id.*  She was having a bad headache once a week.  *Id.*  She had nausea with the headaches, as well as photophobia and

phonophobia.  *Id.*  The impression was migraine headaches.  *Id.*  Dr. Blackburn added Pamelor[14] and Zomig[15] to her medications.  *Id.*

All of Dr. Blackburn's medical reports were copied to Dr. Gwock.  R. 220, 221, 224, 226, 227, 228, 229.

On October 22, 2002, Plaintiff was seen again by Dr. Zislis.  R. 205.  On that day she again presented with a "brighter mood and affect than I have seen her to have in quite some time."  *Id.*  She said she was feeling better.  *Id.*  She attributed this improvement to involvement with Mary Kay Cosmetics, which had increased her social contacts.  *Id.*  The diagnosis was depression, anxiety, and fibromyalgia, stable.  *Id.*  Her medications wee continued.  *Id.*

On December 18, 2002, Dr. Gwock saw Plaintiff.  R. 187.  Plaintiff said she had had a couple of flare ups since he last saw her.  *Id.*  He last saw her on September 20, 2002, with a migraine headache.  R. 188.  She said she experienced tightening of her muscles, and it was very hard for her to get out of bed in the morning.  *Id.*  She said her feet felt like they had "rocks in them," and her skin was very sensitive.  *Id.*  She reported tightness around her shoulders and hips, her hands and arms seemed to be drawing up, and she had problems with her vision.  *Id.*  Massage therapy was still being pursued, but it was becoming too expensive.  *Id.*  She used moist heat, quiet, and sleep to cope with the flare ups.  *Id.*  She was still working and having problems at work, and she was sometimes late for work.  *Id.*  She tried to make up for her lateness by working

---

[14] Pamelor is an antidepressant.  PHYSICIANS' DESK REFERENCE (1998), p. 1889.

[15] Zomig is used for the acute treatment of migraine headaches.  PHYSICIANS' DESK REFERENCE (2004), p. 708.

late. *Id.* Dr. Gwock's diagnosis was fibromyalgia. *Id.* Plaintiff wanted to have a second opinion from Dr. McMillan. *Id.*

On January 21, 2003, Plaintiff saw Dr. Zislis. R. 203. She was stable, with a diagnosis of a history of depression, anxiety, and fibromyalgia. *Id.* She was doing well overall on her current medications, which were continued. *Id.*

This is the last of the evidence that predated the onset date, March 16, 2003. The remainder was discussed to some extent by the ALJ.

On March 21, 2003, Plaintiff returned to Dr. Zislis on an emergency basis. R. 202. Plaintiff had been under increasing stress in the prior weeks, became overwhelmed, and could not return to work. *Id.* She disappeared from her home for one or two days. *Id.* She was located in a parking lot, and was hysterical at the time. *Id.* Her sister tried to have her admitted to a psychiatric hospital in Jacksonville, but she had no insurance coverage. *Id.* Plaintiff said that she wanted to die. *Id.* Plaintiff reported that she had episodic insomnia related to auditory hallucinations occurring during the day and at night. *Id.* Her appearance was "quite overwhelmed and depressed." *Id.* Dr. Zislis's diagnosis was depression, dysthymia, and fibromyalgia, with a current episode of major depression with psychotic features. *Id.* Dr. Zislis began a trial of Effexor[16] and Seroquel,[17] and arranged for admission to the hospital. *Id.*

---

[16] Effexor is prescribed for the treatment of depression – that is, a continuing depression that interferes with daily functioning. Effexor is also prescribed to relieve abnormal anxiety (generalized anxiety disorder and social anxiety disorder), which may include sleep disturbance. PDRhealth™, PHYSICIANS DESKTOP REFERENCE.

[17] Seroquel is prescribed for the treatment of schizophrenia, a mental disorder marked by delusions (false beliefs), hallucinations, disrupted thinking, and loss of contact with reality. It is also used for the treatment of manic and depressive episodes

Plaintiff's GAF[18] score upon admission to the hospital was 35.[19]  R. 165.  On admission she said that she had been experiencing emotional distress at work because her supervisors "would not understand her level of pain and distress and demanded a performance from her that she could not produce."  R. 158.  "This had led to increasing tension."  *Id*.  She said that for the past two years, she had experienced auditory hallucinations that she found to be not troubling, but these had been superimposed on her chronically low moods.  *Id*.  She had been seeing a psychological counselor for 15 years, and had been treated by Dr. Zislis for two years, who managed her medications.  *Id*.  Plaintiff had been followed by Dr. Gwock for fibromyalgia.  *Id*.  She said that the pain of fibromyalgia was debilitating and limited her activities.  *Id*.

Plaintiff was discharged with a GAF score of 79,[20] with an estimated GAF score of 72 for the past year.  R. 159.  She had improved, had a brighter mood and affect, and no longer had auditory hallucinations.  *Id*.  She was optimistic that she could handle the

associated with bipolar disorder.  PDRhealth™, PHYSICIANS DESKTOP REFERENCE.

[18] Global Assessment of Functioning.  Axis V of the DSM-IV Multiaxial System and the meaning of the GAF scores is explained at: http://psyweb.com/Mdisord/DSM_IV/jsp/Axis_V.jsp.

[19] A GAF score of 31-40 indicates: "Some impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant ) OR major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood ( e.g., depressed man avoids friends, neglects family, and is unable to work; child frequently beats up younger children, is defiant at home, and is failing at school )."  *See* http://psyweb.com/Mdisord/DSM_IV/jsp/Axis_V.jsp.

[20] A score of 71-80 indicates: "If symptoms are present, they are transient and expectable reactions to psychosocial. stressors ( e.g., difficulty concentrating after family argument ); no more than slight impairment in social occupational, or school functioning ( e.g., temporarily falling behind in schoolwork ).  *See*, http://psyweb.com/Mdisord/DSM_IV/jsp/Axis_V.jsp.

pain from her disorder.  *Id.*  The diagnosis upon discharge was major depression, severe and recurrent with psychotic features, fibromyalgia, and migraines.  *Id.*

On April 17, 2003, Dr. Gwock referred Plaintiff to Victor M. McMillan, M.D., for a second opinion.  R. 180.  Her complaint to Dr. McMillan was chronic musculoskeletal pain, fatigue, and sleep disturbance.  *Id.*  She said that physical exertion would tend to provoke her symptoms.  *Id.*  She said she had had improvement with psychiatric medications, massage, and heat.  *Id.*  Her attempts at aerobic exercise had failed due to increased pain.  *Id.*  She said she was as close to being pain free as at any time since 1997.  *Id.*  She was then on 12 weeks of medical and family leave.  *Id.*  She had last worked on March 11 or 12, 2002.  R. 181.  Her "health maintenance" was provided by Dr. Gwock.  *Id.*  On physical examination, Dr. McMillan found tender points in 10 of 14.  R. 182.  Dr. McMillan agreed with the diagnosis of fibromyalgia.  *Id.*  He said:

> She has a history of chronic four quadrant and axial articular and
> nonarticular pain.  She has associated fatigue and sleep disturbance.  Her
> tender point examination is not terribly impressive today, though she
> describes this as being as good as she has been for years.

R. 182-183.  He also noted a history of depression.  R. 183.  Dr. McMillan had no recommendations for change of medications or treatment.  *Id.*  He discussed with Plaintiff the potential benefits of disciplined aerobic exercise, with emphasis on consistency rather than quantity.  *Id.*  A copy of the report was sent to Dr. Gwock.  *Id.*

On June 3, 2003, Plaintiff again was seen by Dr. Zislis.  R. 201.  He noted that Plaintiff remained in the psychiatric hospital until March 27, 2003.  *Id.*  She had started

taking Remeron,[21] as well as other medications previously prescribed. *Id.* During this examination, Plaintiff was found to be "somewhat depressed." *Id.* She still experienced some intermittent auditory hallucinations. *Id.* Dr. Zislis increased the dosage of Effexor, started another trial of Seroquel, increased Topamax, discontinued Remeron, and continued Neurontin. *Id.*

On July 15, 2003, Plaintiff returned to Dr. Zislis. R. 200. She reported that she had been doing well with regard to her mood. *Id.* She was walking once again "in a very slowed and halting manner." *Id.* She did not report any complaints that day of exacerbation of fibromyalgia. *Id.* She had some lethargy that she attributed to the increase of Effexor. *Id.* Dr. Zislis thought that the increased lethargy was due to the Seroquel or Neurontin. *Id.* Plaintiff reported she remained "active," though she was no longer working, and Dr. Zislis thought that this meant she did activities with her parents. *Id.*

On August 28, 2003, after NCV[22] testing, Dr. Blackburn determined that Plaintiff had "evidence of moderately severe bilateral carpal tunnel syndrome with greater involvement on the right than left." R. 221. He referred her to Dr. Berg for release surgery. *Id.*

---

[21] Remeron is prescribed for the treatment of major depression – that is, a continuous depressed mood that interferes with everyday life. Remeron is thought to work by adjusting the balance of the brain's natural chemical messengers, especially norepinephrine and serotonin. It belongs to the class of drugs known as tetracyclics and is chemically unrelated to other antidepressants such as serotonin reuptake inhibitors and MAO inhibitors. PDRhealth™, PHYSICIANS DESKTOP REFERENCE.

[22] Nerve conduction velocity testing. DORLAND'S MEDICAL DICTIONARY FOR HEALTHCARE CONSUMERS.

On September 10, 2003, Plaintiff complained to Dr. Zislis of a fibromyalgia flare

up.  R. 200.  She was not working, and was pursuing disability claims.  *Id*.  She still had

auditory hallucinations.  *Id*.

On December 2, 2003, Plaintiff was again seen by Dr. Zislis.  R. 199.  She was

ambulating very slowly with a cane.  *Id*.  Plaintiff said she frequently experiences

fibromyalgia flare ups that prevent her from participating in activities with friends.  *Id*.

She said her friends sometimes do not understand fibromyalgia.  *Id*.  She was

alternating living one week with her parents and one week on her own.  *Id*.  She also

attended support groups and psychotherapy.  *Id*.  She was anxious while alone, and her

mood had been sad.  *Id*.  She denied any psychotic (hallucinatory) symptoms at that

time.  *Id*.

On March 2, 2004, Plaintiff returned to Dr. Zislis.  R. 199.  She had a "brighter

mood."  *Id*.  She had been taking yoga and nutrition classes.  *Id*.

On June 2, 2004, Dr. Zislis saw Plaintiff.  R. 198.  She had a "fairly bright mood"

that day.  *Id*.  She had lost 20 pounds, and had been attending yoga and nutrition

classes.  *Id*.  She had discontinued Seroquel to try to lose weight, but her mood

worsened, and she started it up again.  *Id*.  The diagnosis was recurrent depression with

psychotic features, stable.  *Id*.

On February 11, 2005, Plaintiff saw Dr. Zislis.  R. 198.  It was noted that she was

five months overdue for an appointment, and should have been out of medications

months ago.  *Id*.  She had been a little bit restless and anxious.  *Id*.  She had been

sleeping both day and night.  *Id*.  She had been walking.  *Id*.  She denied having

hallucinations. *Id.* She had the feeling, though, that someone was always watching her. *Id.*

On February 22, 2005, Dr. Blackburn again saw Plaintiff at his office. R. 220. She reported that she had been doing well with her headaches since he had last seen her in August, 2003. *Id.* She had been having more headaches since she stopped taking Effexor and Topamax and started on Seroquel. *Id.* She had had a few migraines in the past few weeks, whereas the migraines had been occurring once every one or two months previously. *Id.*

On April 6, 2005, Plaintiff told Dr. Zislis she was feeling better, and was working at losing weight. R. 197. She had lost 25 pounds from the visit in February. She denied hallucinations or paranoia. *Id.* The diagnosis continued to be stable recurrent depression with psychotic features. *Id.* Her medications were adjusted. *Id.*

On June 2, 2005, Dr. Blackburn noted that after Plaintiff went back to Topamax, her headaches "settled down right away." R. 218. Her last headache had been a month earlier. *Id.* His impression was "migraine headaches, doing well." *Id.*

On June 29, 2005, Plaintiff again saw Dr. Zislis. R. 223. She appeared a "bit brighter." *Id.* She reported a noise in her ears and a sense of someone in the room with her. *Id.* She complained of continued fibromyalgia pain with periodic exacerbations. *Id.* Again, a history of chronic pain and recurrent depression with psychotic features was noted. *Id.*

On December 21, 2005, Dr. Blackburn found that Plaintiff had longstanding migraine headaches, chronic pain, and fibromyalgia. R. 279. He said her headaches

had been "doing great" on Topamax. *Id.* She had had only three or four in the past six months. *Id.* She complained of a little back and hip pain that day, and he noted a history of multifocal pains. *Id.* He scheduled Plaintiff to return in six months. *Id.*

On March 16, 2006, Plaintiff again saw Dr. Zislis. R. 312. She said she had been doing well and was more active. *Id.* She denied any hallucinations or paranoia, and said her fibromyalgia pain was much better. *Id.* The diagnosis was recurrent psychotic depression, stable, and fibromyalgia, chronic pain syndrome. *Id.*

On June 20, 2006, Plaintiff reported to Dr. Blackburn that she had "a little bit of wrist pain and hip pain, but the migraines have been doing great." R. 278. She had had only three headaches in the prior six months. *Id.* He ordered her to continue with her current regimen and return in six months. *Id.*

On November 9, 2006, Plaintiff told Dr. Zislis she had been doing well of late, but the increase in cold weather had increased muscle [illegible]. R. 310. As with all visits, her medications were continued. *Id.* and R. 309.

On March 8, 2007, Dr. Zislis found that Plaintiff was doing well overall. R. 310. She had frequent days of low energy and complained of increased migraine headaches. *Id.* Her medications were Cymbalta, Topamax, and Seroquel. R. 309. Wellbutrin was added. On April 2, 2009. R. 307.

On April 5, 2007, Dr. Blackburn said that Plaintiff had been having headaches twice a week on average. R. 277. His diagnosis was chronic refractory migraines. *Id.*

On April 27, 2007, Dr. Zislis completed a mental residual functional capacity questionnaire. R. 303-306. Dr. Zislis said that Plaintiff "may become easily

overwhelmed by even minor stress or responsibilities and would likely decompensate,

possibly to a severe degree." R. 305. He said that she had "required psychiatric

hospitalization for severe major depression with psychotic features." *Id.* He said that as

a basis for his opinion, Plaintiff had a "history of chronic depression and anxiety and

recurrent severe major depression with psychotic features as well as fibromyalgia and

migraine headaches." *Id.* Dr. Zislis further said: "For the past several years she has

been very socially isolated to her home. She ambulates slowly and at times becomes

bedridden owing to chronic generalized musculoskeletal pain with frequent

exacerbations." *Id.* Dr. Zislis said that Plaintiff's impairments could be expected to last

more than 12 months, and that Plaintiff "feels she is unable to work in any capacity, now

or in the foreseeable future." R. 306. He thought that her limitations were "ongoing for

the foreseeable future." *Id.*

On May 16, 2007, Dr. Gwock completed a residual functional capacity

questionnaire. R. 284. He said that he had treated Plaintiff for 20 years, and the last

office visit was in March, 2006. *Id.* He said that Plaintiff met the American College of

Rheumatology criteria for a diagnosis of fibromyalgia, and, in addition, had depression,

hyperlipodemia, allergies, urinary incontinence, and was over weight. *Id.* He said that

Plaintiff's fibromyalgia symptoms included multiple tender points, nonrestorative sleep,

chronic fatigue, morning stiffness, muscle weakness, constipation, frequent severe

headaches, numbness and tingling, anxiety, depression, and right carpal tunnel

syndrome. *Id.* He said that Plaintiff is not a malingerer, and that emotional factors

contribute to her symptoms. R. 285. He said that she had pain bilaterally in her

lumbosacral spine, cervical spine, thoracic spine, chest, shoulders, arms, hands,

fingers, hips, legs, knees, ankles, and feet. *Id.* He said that Plaintiff had achy

shoulders, sharp pain in her SI joints, and stinging in her hips, elbows, and knees. *Id.*

Dr. Gwock said that Plaintiff's pain is precipitated by changing weather, stress, fatigue,

movement, cold, and a static position. *Id.* He said that Plaintiff's experience of pain

was constantly severe enough to interfere with her attention and concentration at work.

*Id.* He said that Plaintiff was incapable of performing even a low stress job. *Id.* Dr.

Gwock thought that Plaintiff could walk about one city block, sit for 30 minutes, stand for

20 minutes, and sit, stand, and walk less than two hours in a normal working day. R.

286. He said that Plaintiff would sometimes need to take unscheduled breaks during an

8 hour work day. *Id.* He said that Plaintiff's impairments would produce good and bad

days. R. 287. Dr. Gwock said that the earliest date that the symptoms began was in

1997. *Id.*

In summary, the ALJ erred by not considering the evidence prior to March 16,

2003. The evidence is relevant to Plaintiff's claim. It is relevant to the issue of whether

Plaintiff's testimony is credible and to the issue of whether the opinions of treating

physicians should be given substantial weight. A remand to discuss and consider all of

this evidence would ordinarily be recommended. It is not here, as will be discussed

ahead.

### Whether the ALJ erred in failing to give substantial weight to the opinions of treating physicians

The Administrative Law Judge gave "little weight" to the opinions of Drs. Zislis

and Gwock. R. 366. Plaintiff contends that this was error.

Case No. 4:08cv492-MP/WCS

The opinion of a claimant's treating physician must be accorded considerable weight by the Commissioner unless good cause is shown to the contrary.  Lewis v. Callahan, 125 F.3d 1436, 1440 (11th Cir. 1997).  This is so because treating physicians:

> are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations.

20 C.F.R. § 404.1527(d)(2).  Important to the determination of whether there is a "detailed, longitudinal picture" of impairments is the length of the treatment relationship, the frequency of examination, the extent of the knowledge of the treating source as shown by the extent of examinations and testing, the evidence and explanation presented by the treating source to support his or her opinion, the consistency of the opinion with the record as a whole, and whether the treating source is a specialist with respect to the particular medical issues.  20 C.F.R. § 404.1527(d)(2)-(5).

The reasons for giving little weight to the opinion of a treating physician must be supported by substantial evidence, Marbury v. Sullivan, 957 F.2d 837, 841 (11th Cir. 1992), and must be clearly articulated.  Phillips v. Barnhart, 357 F.3d 1232, 1241 (11th Cir. 2004).  "The Secretary must specify what weight is given to a treating physician's opinion and any reason for giving it no weight, and failure to do so is reversible error." MacGregor v. Bowen, 786 F.2d 1050, 1053 (11th Cir. 1986).   "Where the Secretary has ignored *or* failed properly to refute a treating physician's testimony, we hold as a matter of law that he has accepted it as true."  *Id.* (emphasis added);  Elam v. Railroad

Retirement Bd., 921 F.2d 1210, 1217 (11th Cir. 1991); Critchfield v. Astrue, 2009 WL 635698 (N.D. Fla. Mar 10, 2009) (No. 308cv32-RV/MD).

The ALJ wrote that he gave little weight to the opinion of Dr. Zislis because Plaintiff had not been hospitalized since March, 2003, for mental health treatment, and Dr. Zislis's notes "reveal overall stability of the claimant's condition." R. 366. He found that Plaintiff "tolerates all of her medications well," and "[a]lthough she alleges depression and that she spends most of her time at home, she admitted she goes out occasionally with friends to dinner or the movies and is sociable." R. 367. The ALJ rejected the opinion of Dr. Gwock because, although Dr. Gwock said he had treated Plaintiff for 20 years, "the evidence includes minimal records from Dr. Gwock." R. 366.

These reasons are insufficient to refuse to give substantial weight to the opinions of these two treating physicians. The initial error was in failing to discuss the records that predated the alleged onset date, on March 16, 2003. Those records were highly relevant to the issue of whether to give substantial weight to the opinions of Dr. Zislis and Dr. Gwock. Plaintiff had been under the care of Dr. Zislis and Dr. Gwock for years, and they knew the correlation between her fibromyalgia pain, depression, headaches, and the stress of a full time job. Most of these records were sent to Dr. Gwock as Plaintiff's primary physician, and Dr. Gwock was responsible for all of the referrals to specialists. Both Dr. Gwock and Dr. Zislis also had Dr. Szczesny's opinions to consider, which were fully consistent with their own. The conclusion that Plaintiff's mental condition is "stable" is supported by the later records from Dr. Zislis, but fails to consider the fact that Plaintiff at that time was under no stress at all. She not working, and spent

her days trying to cope with her fibromyalgia.  She continued to take strong medications

to manage her depression, migraine headaches, and fibromyalgia pain, and arranged

her life to avoid all stress so as to avoid fibromyalgia flare ups.  Finally, getting out of the

house a few times a month does not show an ability to work 40 hours a week.  Since

the reasons provided for failing to give substantial weight to the opinions of two treating

physicians are insufficient, this court must now accept those opinions as true.

**Conclusion**

Considering the record as a whole, the findings of the Administrative Law Judge

was not based upon substantial evidence in the record and did not correctly follow the

law.  The decision of the Commissioner to deny Plaintiff's application for benefits should

be reversed.

Accordingly, it is **RECOMMENDED** that the decision of the Commissioner to

deny Plaintiff's application for Social Security benefits be **REVERSED** and the

Commissioner be **ORDERED** to grant Plaintiff's applications for benefits.

**IN CHAMBERS** at Tallahassee, Florida, on November 9, 2009.


**s/    William C. Sherrill, Jr.**
**WILLIAM C. SHERRILL, JR.**
**UNITED STATES MAGISTRATE JUDGE**


**<u>NOTICE TO THE PARTIES</u>**

**A party may file specific, written objections to the proposed findings and recommendations within 15 days after being served with a copy of this report and recommendation.  A party may respond to another party's objections within 10 days after being served with a copy thereof.  Failure to file specific objections limits the scope of review of proposed factual findings and recommendations.**

Case No. 4:08cv492-MP/WCS